IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 14-98 |
| | ) | |
| WILLIAM PERRY BAGLEY | ) | |

OPINION

DIAMOND, D.J.

On April 22, 2014, William Perry Bagley ("defendant") was charged in a two-count indictment with: conspiracy to falsely make, forge and counterfeit over $14,000 of federal reserve notes and to pass, utter or publish falsely made, forged, counterfeited and altered $100 federal reserve notes (Count 1); and; with falsely making, forging and counterfeiting federal reserve notes (Count 2).

Currently pending before the court are three pretrial motions, as well as various supplements thereto, filed by or on behalf of defendant: (1) a motion to preserve law enforcement rough notes; (2) a motion to produce 404(b) evidence; and, (3) a motion to suppress evidence seized pursuant to the execution of a search warrant on June 20, 2013.[1] The government filed an omnibus response to the first two motions as well as a separate response to defendant's pending suppression motion, to which defendant filed a reply.

---

[1] The first two pending motions were filed by Assistant Federal Public Defender Akin Adepoju, who subsequently withdrew from this case due to a conflict of interest with a potential witness. The pending suppression motion was filed by Michael E. Moser, Esq., who was appointed to replace AFPD Adepoju. Prior to his withdrawal, AFPD Adepoju also had filed on defendant's behalf a motion to suppress as well as a supplement thereto. However, the suppression motion filed by Attorney Moser "replaces and supersedes" the suppression motion and supplement previously filed by AFPD Adepoju. *See* Document No. 52 at p. 1. Accordingly, defendant's original suppression motion (Document No. 33) and supplement (Document No. 37) will be dismissed.

After reviewing the parties' papers, this court determined that a hearing was necessary limited solely to the issue of whether the search warrant lacked particularity as to the location to be searched. On the eve of the scheduled suppression hearing, defendant, through counsel, filed a supplement to the suppression motion, to which the government also filed a response. The suppression hearing was held on July 30, 2015. Following the suppression hearing, defendant, *pro se*, filed yet another supplement to his motion to suppress.

For the reasons set forth below, defendant's motion to preserve law enforcement rough notes and motion to produce Rule 404(b) evidence will be granted, but his motion to suppress will be denied.

I.    **Motion to Preserve Law Enforcement's Rough Notes (Document No. 34)**

Defendant's first motion seeks an order requiring all law enforcement officers involved in the investigation of this case to retain and preserve all of their rough notes and other writings which may constitute materials discoverable under Brady v. Maryland, 373 U.S. 83 (1963), or the Jencks Act, 18 U.S.C. §3500(b), or which may be used by the defense for impeachment purposes.

The government has indicated that it is aware of its obligation to retain these materials pursuant to United States v. Ramos, 27 F.3d 65 (3d Cir. 1994), Ammar v. United States, 714 F.2d 238 (3d Cir. 1983) and United States v. Vella, 562 F.2d 275 (3d Cir. 1977). Accordingly, the court will enter an order granting the motion and requiring the government to preserve any such materials.

✎AO 72
(Rev. 8/82)

## II.  **Motion to Produce Evidence under FRE 404(b) & 609**  (Document No. 35)

Defendant's second motion requests an order compelling the government to provide notice

of any evidence it intends to introduce at trial under Rules 404(b) and 609 of the Federal Rules of

Evidence. This motion will be granted.[2]

While "evidence of a crime, wrong or other act is not admissible to prove a person's

character in order to show that on a particular occasion the person acted in accordance with the

character," Fed.R.Evid. 404(b) provides that such evidence may be admissible[3] for another purpose,

such as proving "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of

mistake or lack of accident," *provided* that, upon request by the defendant, the government must

provide reasonable notice in advance of trial, or during trial for good cause, of the general nature

of any such evidence it intends to introduce at trial.

In its response, the government indicates that it has yet to identify the specific 404(b)

evidence it may seek to introduce against defendant at trial, but that it will provide formal notice

of its intent to use any such evidence at least 2 weeks prior to trial. While Rule 404(b) provides

no specific time limit for pretrial notice, this time frame is more than sufficient to constitute

---

[2]  While granting defendant's request that the government provide notice of any evidence it intends to offer under F.R.E. 404(b) and 609, the court cannot at this time make any ruling as to the admissibility of any such evidence. As a general rule "objections as to the admissibility of prior bad acts under Rule 404(b) are properly asserted during trial, not at the pretrial stage." United States v. Giampa, 904 F.Supp. 235, 284 (D.N.J. 1995). Similarly, this court is in no position to make a pretrial ruling on the admissibility of any prior convictions under Rule 609 outside the context of trial. *See, e.g.,* United States v. Luce, 469 U.S. 38, 41 (1984)(in order to perform balancing of probative value of a prior conviction against prejudicial effect, the court must know the precise nature of the defendant's testimony).

[3]  Evidence is admissible under Rule 404(b) if: (1) it has a proper purpose under Rule 404(b); (2) it is relevant under Rules 401 and 402; (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice under Rule 403; and (4) the court charges the jury to consider it only for the limited purpose for which it is admitted. United States v. Vega, 285 F.3d 256, 261 (3d Cir. 2002)(*citing* Huddleston v. United States, 485 U.S. 681, 691-92 (1988)).

AO 72
(Rev. 8/82)

reasonable notice. Other courts that have considered what constitutes "reasonable notice" have concluded that even shorter periods of time are sufficient notice under the rule. See United States v. Evangelista, 813 F.Supp. 294, 302 (D.N.J. 1993) (ten days); United States v. Alex, 791 F.Supp. 723, 728-29 (N.D.Ill. 1992) (seven days); United States v. Williams, 792 F.Supp. 1120, 1133 (S.D.Ind. 1992) (ten days).

Rule 609(a)(1)(B) provides that, for the purpose of attacking a testifying defendant's character for truthfulness by evidence of a criminal conviction, evidence that the defendant has been convicted of any crime punishable in the convicting jurisdiction by death or imprisonment for more than one year must be admitted if the court determines that the probative value of that evidence outweighs its prejudicial effect to the defendant. The rule also provides that evidence that any witness has been convicted of any crime must be admitted, regardless of punishment, "if the court can readily determine that establishing the elements of the crime required proving - or the witness's admitting - a dishonest act or false statement." F.R.E. 609(a)(2).

The only advance notice requirement under Rule 609 is that the government must provide "reasonable advance written notice" of its intent to use the evidence if 10 years have passed since the conviction or release from confinement for it, whichever is later. Fed.R.Evid. 609(b). In its response, the government indicates that it already has provided defendant with a copy of his criminal history and that, in the event defendant testifies or introduces evidence of good character, it will seek to introduce evidence of these convictions pursuant to Rule 609 and may seek to introduce such evidence under Rule 404(b).

4

Accordingly, defendant's motion to provide notice of any evidence the government intends to introduce at trial under Fed.R.Crim.P 404(b) or 609 will be granted, and an order will be entered requiring the government to provide notice of the general nature of any such evidence no later than two weeks prior to trial. Any rulings on the admissibility of any such evidence will be reserved until the time of trial.

III.   **Motion to Suppress**   (Document No. 52)

Defendant's third motion seeks suppression of all physical evidence seized from 908 Brookline Boulevard, Apt. #2, Pittsburgh, Pennsylvania 15226, pursuant to a search warrant issued on June 20, 2013, by United States Magistrate Judge Cynthia Reed Eddy.

Defendant has raised four separate grounds for suppression: (1) the search warrant affidavit lacks probable cause because it is based on stale information; (2) the search warrant affidavit lacks probable cause because it is based on unreliable information from individuals identified as R.H. and J.R.; (3) the search warrant affidavit contained false statements and deliberately omitted material facts known to the affiant designed to mislead the magistrate judge into issuing the search warrant; and, (4) the search warrant lacked particularity as to the location to be searched.

As previously noted, upon an initial review of the parties' papers, this court determined that no hearing was required as to any of the first three grounds for suppression and, for the following reasons, now finds as a matter of law that each of those three stated challenges to the validity of the warrant is without merit.

AO 72
(Rev. 8/82)

As to the fourth ground for suppression, the court heard testimony and received evidence at the suppression hearing held on July 31, 2015, limited solely to that claim. Upon due consideration of that testimony and evidence, this court now finds, for the reasons set forth below, that the search warrant adequately described the location to be searched with sufficient particularity as to comply with the Fourth Amendment. Moreover, even if the warrant had lacked sufficient particularity, the good faith exception to the exclusionary rule would apply in this case, and there would be no cause to suppress the evidence.

## A.    **The Application and Affidavit for Search Warrant**

On June 20, 2013, Special Agent Mark Kernan of the United States Secret Service ("USSS") submitted an application and affidavit for search warrant for the residence located at 908 Brookline Boulevard, Apt. #2, Pittsburgh, Pennsylvania 15226.[4] Attachment A to the application described the residence to be searched and attachment B described in detail the items to be seized, to include "any fruits, evidence, contraband, and instrumentalities" relating to making, passing and dealing counterfeit obligations and securities.

Agent Kernan submitted the following information as probable cause to believe that "the subject residence, occupied by William Perry Bagley and Sherita Howard, contains equipment and other materials for the manufacturing of U.S. counterfeit currency and other fraudulent securities and documents which will constitute evidence of [counterfeiting]."

---

[4] The unredacted application and affidavit for search warrant, along with the search warrant and attachments, was offered without objection and admitted into evidence as Government Exhibit 2 at the suppression hearing held on July 30, 2015.

6

From May 2013 until June 20, 2013, the USSS was investigating the passing of counterfeit $100 federal reserve notes ("FRNs") that actually were bleached $5 bills. As part of this investigation, the USSS collected surveillance videos, witness statements, and sale/return receipts from victim businesses where the counterfeit FRNs were passed.

After being notified that a confidential witness ("CW1") was willing to provide information relating to the manufacturing of counterfeit $100 bills, Agent Kernan met with CW1 on June 7, 2013, at the Mt. Oliver police station. CW1 stated that he had met a person named William Perry Bagley, a/k/a Bridge, in August of 2011 and that the two previously had committed crimes together, including robbery, drug trafficking and manufacturing counterfeit currency. He further stated that Bagley "drives a dark colored Chevy Impala or a dark colored Pontiac GM, that he resides with numerous girlfriends, and that he carries a Glock .45, a firearm, at all times." Government Exhibit 2 at ¶11.

Specifically with respect to counterfeiting, CW1 indicated that he first started to "break down" counterfeit $100 FRNs at Bagley's direction and explained that to "break down" means that the counterfeit $100 FRNs were passed at retail stores to purchase a small dollar item for the purpose of receiving genuine currency. The proceeds were returned to Bagley and CW1 would receive either a percentage or would be permitted to keep the purchased item. CW1 stated that the bills often were passed at bars because "it was dark and often very busy" and that he did not pass the counterfeit currency at retail stores that had video surveillance. Government Exhibit 2 at ¶12.

CW1 told Agent Kernan that from August of 2011 until May of 2012, thousands of dollars in counterfeit currency in denominations of $20, $50 and $100 were manufactured with an all-in-one printer/copier/scanner at the residences of two of Bagley's girlfriends, that of Sherita Howard

7

at 908 Brookline Boulevard, Apt. #2, Pittsburgh, PA 15226, and that of "A.P" at 217 Locust Street, Pittsburgh PA 15210. CW1 stated that he was present at both locations and that he witnessed, and assisted in, the manufacturing of counterfeit currency. Government Exhibit 2 at ¶13. The CW1 also provided specific details as to how the counterfeit currency was manufactured and the equipment used to manufacture it, as well as details indicating that Bagley sold the counterfeit $100 FRNs for $30-$40 dollars and the counterfeit $50 FRNs for $15-$20. Government Exhibit 2 at ¶¶14 & 15.

CW1 subsequently was arrested and incarcerated for an unrelated matter and was released from prison in February of 2013. Government Exhibit 2 at ¶16. On June 5, 2013, CW1 had a conversation with "K.W." who is the brother of one of defendant's girlfriends, A.P., during which K.W. stated that Bagley had developed a new technique for manufacturing counterfeit currency with a laptop computer. Government Exhibit 2 at ¶17.

On June 12, 2013, Agent Kernan met with CW1 again. CW1 stated that he had had another conversation with K.W. at 217 Locust Street and that K.W. indicated that Bagley still is manufacturing currency at Sherita Howard's residence at 908 Brookline Boulevard, Apt. #2. Government Exhibit 2 at ¶18.

On June 20, 2013, Agent Kernan was contacted by the O'Hara Township Police Department and informed that they had arrested two persons, R.H. and J.R., for passing a counterfeit $100 FRN at the Community Market on Freeport Road in Pittsburgh. Agent Kernan met with R.H. at the police station and recognized him as one of the persons appearing on surveillance videos concerning the passing of counterfeit $100 FRNs. Government Exhibit 2 at ¶19 & 20. R.H. was Mirandized and agreed to answer questions. He told Agent Kernan that he

previously had passed counterfeit FRNs for Bagley in 2012 and had started to pass them again in 2013 after his release from jail. He indicated that in 2013 he had passed the counterfeit currency "four to eight times" at various retail stores in Western Pennsylvania. He advised that he is Sherita Howard's brother and that he has known Bagley for many years, and that he was present at 908 Brookline Boulevard, Apt. #2, on June 18, 2013, where counterfeit $100 FRNs were manufactured. Government Exhibit 2 at ¶21.

R.H. also described in detail how Bagley manufactures the counterfeit currency, including the use of a solution called Purple Power to remove the ink from genuine $5 FRNs by submerging them in a bowl or bucket of the solution and then placing them in the microwave, rinsing them with water and ironing them dry. Once the ink is removed, a genuine $100 FRN is scanned into a printer/copier/scanner and printed onto the bleached $5 FRNs. Bagley then sprays aqua net hair spray onto the counterfeit FRNs to defeat counterfeit detection pens. Government Exhibit 2 at ¶22. R.H. further stated that Bagley also manufactures counterfeit checks by way of a "check kit" purchased at Staples. He indicated that Bagley pays individuals to have their paychecks photographed then uses the routing number, account number and other information from those checks to make counterfeit checks, which Bagley then pays the person to cash at Wal-Mart department stores. Government Exhibit 2 at ¶23.

Still on June 20, 2013, Agent Kernan met with J.R., whom he also recognized as one of the persons who appears on surveillance videos concerning the passing of counterfeit $100 FRNs. J.R. also was Mirandized and agreed to answer questions. He indicated that from May 9, 2013, to June 20, 2013, at numerous locations he passed counterfeit currency that he had received from a person he knows as Bridge who resides in Brookline. He stated that he had been to Bridge's

9

apartment located at 908 Brookline Boulevard, Apt. #2, "ten to twenty times" where he was given

two to four counterfeit $100 FRNs to "cash-in," *i.e.*, to spend to purchase smaller dollar items for

the purpose of receiving genuine currency in change. He indicated that he was last at 908

Brookline Boulevard, Apt. #2, on June 18, 2013. Government Exhibit 2 at ¶¶24-26.

On June 20, 2013, at 11:35 p.m., upon review of the Application and Affidavit for Search

Warrant, Magistrate Judge Eddy issued a search and seizure warrant authorizing the search of 908

Brookline Boulevard, Apt. #2, as described in Attachment A, finding probable cause to believe that

the items described in Attachment B likely were to be found at that location. *See* Search and

Seizure Warrant with Attachments A & B, Government Exhibit 2.


B. **Analysis**

1. **General principles**

The Fourth Amendment to the United States Constitution provides:

> "[t]he right of the people to be secure in their persons, houses,
> papers, and effects, against unreasonable searches and seizures,
> shall not be violated, and no Warrants shall issue, but upon probable
> cause, supported by Oath or affirmation, and particularly describing
> the place to be searched, and the persons or things to be seized."

U.S. Const. amend. IV.

By its plain text, the Fourth Amendment only prohibits "unreasonable" searches and

seizures. US v. Katzin, 769 F.3d 163, 169 (3d Cir. 2014)(*citing* Skinner v. Ry. Labor Executives'

Ass'n, 489 U.S. 602, 619 (1989). Accordingly, "the touchstone of the Fourth Amendment is

reasonableness." Florida v. Jimeno, 500 U.S. 248, 250 (1991).

AO 72
(Rev. 8/82)

The Fourth Amendment further requires that search warrants be supported by probable cause. U.S. Const. amend. IV. Whether probable cause exists is to be determined by a practical and common sense approach. Illinois v. Gates, 462 U.S. 213 (1983). The appropriate inquiry is "whether, given all the circumstances set forth in the affidavit before [the magistrate], including the [veracity] and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. at 238-39. The Court stated that "probable cause is a fluid concept--turning on the assessment of probabilities in particular factual contexts ...." Id.

In Massachusetts v. Upton, 466 U.S. 727 (1984), the Supreme Court emphasized that the reviewing court is not to conduct a "de novo probable cause determination" but is to decide merely "whether the evidence reviewed as a whole provided a substantial basis for the magistrate's finding of probable cause." Thus, the warrant is to be upheld as long as there is a "substantial basis" for a "fair probability" that specified evidence will be found in a particular place. Id.; United States v. Tehfe, 722 F.2d 1114, 1119 (3d Cir. 1983)(application for a search warrant must "establish that certain items are probably located at the present time in a certain place.")

In making this determination, this court is to consider "the facts that were before the magistrate judge, i.e., the affidavit, and [does] not consider information from other portions of the record." United States v. Jones, 994 F.2d 1051, 1055 (3d Cir. 1993). The affidavit supporting a search warrant application "must be read in its entirety and in a common sense and nontechnical manner." United States v. Williams, 124 F.3d 411, 420 (3d Cir. 1997). The affidavit need not contain direct evidence linking the place to be searched to the crime. Id. "Instead, probable cause can be, and often is, inferred by considering the type of crime, the nature of the items sought, the

suspect's opportunity for concealment and normal inferences about where a criminal might hide [contraband]." Jones, 994 F.2d at 1056 (internal quotation and citation omitted).

### 2. **Staleness**

Defendant's first argument is that the search warrant affidavit lacked probable cause because the information set forth in the affidavit from CW1 linking counterfeiting activity to Sherita Howard's residence at 908 Brookline Boulevard, Apt. #2, was stale. Specifically, defendant contends that CW1 "primarily" was discussing counterfeiting operations occurring at that location from August 2011 to May 2012 and that this information therefore was too old to be used to establish probable cause to believe that counterfeiting was occurring there in June 2013 when the warrant was issued. Defendant's argument is without merit.

The "[a]ge of the information supporting a warrant application is a factor in determining probable cause." United States v. Harvey, 2 F.3d 1318, 1322 (3d Cir. 1993). "If too old, the information is stale, and probable cause may no longer exist." Id. However, while the age of the information supporting a warrant application is a factor in determining probable cause, age alone does not determine staleness. United States v. Zimmerman, 277 F.3d 426 (3d Cir. 2002). Rather, other variables such as the nature of the crime and the type of evidence to be seized also must be examined. Id.; Harvey, 2 F.3d at 1322. Probable cause to search exists where information suggests that the items sought will be in the location searched at the time the warrant issues. Tehfe, *supra*, 722 F.2d at 1119.

Here, defendant's staleness argument focuses almost exclusively on the historical information from CW1 set forth in ¶13 of the affidavit relating to events occurring from August

AO 72
(Rev. 8/82)

2011 to May 2012. However, "'statements in an affidavit may not be read in isolation—the affidavit must be read as a whole.'" United States v. Whitner, 219 F.3d 289, 296 (3d Cir. 2000)(*quoting* United States v. Conley, 4 F.3d 1200, 1208 (3rd Cir. 1993). Here, the affidavit as a whole contains additional information beyond the time period of August 2011 to May 2012 linking 908 Brookline Boulevard, Apt. #2, to counterfeiting activity much closer in time to the issuance of the warrant.

Specifically, at ¶18 of the affidavit, Agent Kernan averred that he had met with CW1 for a second time on June 12, 2013, at which time CW1 indicated he had another conversation with K.W., the brother of A.P., who stated that defendant still was manufacturing counterfeit currency at 908 Brookline Boulevard, Apt. #2. While CW1 did not give a specific date for this second conversation with K.W., it clearly took place after the initial meeting between Agent Kernan and CW1 on June 7, 2013, and their second meeting on June 12, 2013.

Defendant suggests that this court should disregard the additional information from CW1 relating to counterfeiting activity occurring at 908 Brookline Boulevard, Apt. #2, in June of 2013 because it is "unreliable and uncorroborated hearsay" from K.W.. However, this information in fact was corroborated by the information received from both R.H. and J.R. that counterfeit currency was being manufactured at Sherita Howard's apartment as recently as June 18, 2013.[5]

---

[5] Defendant faults Kernan for failing to interview K.W. or A.P. to verify CW1's information prior to the search warrant application. Kernan did interview A.P. on June 26, 2013, and she denied any knowledge of or involvement with the passing of counterfeit currency, although she did witness defendant "glue together a bus pass" at 217 Locust Street in early 2013 and admitted she transported J.R. on a number of occasions to sell bus passes. (Doc. #52, Ex. B). Defendant avers that had Kernan interviewed A.P. before he applied for the warrant, he would have known that the information from CW1 relating to the manufacturing of counterfeit currency at A.P.'s residence was "false and unreliable." Defendant's argument is unavailing for several reasons. First, merely because A.P. denied knowledge of or involvement with the passing of counterfeit currency does not mean that the information from CW1 was false, as A.P. may not have been telling the truth. Moreover, even if A.P. had no knowledge regarding counterfeit

AO 72
(Rev. 8/82)

Specifically, the affidavit contains information at ¶21 from R.H., who stated that he was present on June 18, 2013, at Sherita Howard's apartment at 908 Brookline Boulevard, Apt. #2, where counterfeit currency was manufactured, and information at ¶26 from J.R., who indicated that he had been to that same location, where he received counterfeit FRN's, "ten to twenty times," and that he last had been there on June 18, 2013.[6] Accordingly, the information in the affidavit indicated that counterfeit currency still was being manufactured at 908 Brookline Boulevard, Apt. #2, as recently as two days to no more than 2 weeks prior to the issuance of the warrant.

Moreover, the information from CW1 regarding activities at 908 Brookline Boulevard, Apt. #2, from August 2011 to May 2012, was important background information which, coupled with the information that CW1 received that counterfeit currency still was being manufactured there in June 2013, suggested that the counterfeiting activity was of an ongoing nature, making it more likely that evidence of that activity would be at that location on the day the warrant issued, particularly in light of the information from R.H. and J.R. that they were present at that same location, where counterfeit currency was being manufactured, as recently as June 18, 2013.

---

currency, her residence was not the target of the search. Finally, Kernan was not obligated to conduct a full investigation prior to seeking a warrant, nor to establish that every statement made by CW1 was correct, he only needed corroboration of the information that defendant was manufacturing counterfeit currency at 908 Brookline Boulevard, Apt. #2, in early June of 2013, and he received that corroboration through the information from R.H. and J.R.. *See, e.g.,* United States v. Gourde, 440 F.3d 1065, 1073 n. 5 (9th Cir. 2006)("[T]he benchmark is not what the FBI 'could have' done. An affidavit may support probable cause even if the government fails to obtain potentially dispositive information.")

[6] In his *pro se* supplement, defendant states that the information received from R.H. and J.R. that they last were at 908 Brookline Boulevard, Apt. #2, on June 18, 2013, is false because they both were there on June 20, 2013. The court notes that while the affidavit does indicate that J.R. stated that he last was there on June 18, 2013 it does *not* indicate that R.H. stated he "last" was there on June 18, 2013, only that he was there on June 18, 2013. In any event, even if both had been there on June 20, 2013, this minor inaccuracy would have no impact on the probable cause determination. To the extent defendant challenges the reliability of the information from R.H. and J.R. on other grounds, that issue is addressed below.

AO 72
(Rev. 8/82)

"[W]hen an activity is of a protracted and continuous nature, 'the passage of time becomes less significant.' " Tehfe, 722 F.2d at 1119 (*quoting* United States v. Harris, 482 F.2d 1115, 1119 (3d Cir.1973)). Thus, when the criminal activity has been going on continuously for years, staleness is of less concern. Williams, 124 F.3d at 420. Furthermore, "[t]he fact that evidence of the suspected criminal activity continued up through the last weeks before the search strongly suggests that the information in the affidavit was not stale." Id. at 421.

Here, the historical information from CW1 that the manufacturing of counterfeit currency was occurring at 908 Brookline Boulevard, Apt. #2, from August 2011 to May 2012, provided a link to the information from CW1, R.H. and J.R. that the same activity still was occurring in June 2013, thus creating a strong inference that the activity was of an ongoing nature and making it more likely that evidence relating to the manufacture of counterfeit currency would be found at that location on the day the warrant was issued. *See, e.g.*, United States v. Yusuf, 461 F.3d 374, 392 (3d Cir. 2006)(inclusion of historical information from two years earlier provided link between alleged current criminal activity and similar activity that took place over preceding twenty months, suggesting pattern of activity continuous in nature); United States v. Marranca, 98 Fed. Appx. 179, 181-82 (3d Cir. 2004)(considering continuing nature of gambling operation, information in affidavit relating to history of large-scale operation dating back months or years to execution of warrant not stale where other information in affidavit set forth information discovered days before search indicating operation currently was ongoing).

Read as a whole, the affidavit in this case indicated that counterfeiting activity at 908 Brookline Boulevard, Apt. #2, was protracted and continuous and that it was ongoing just two days to two weeks prior to the warrant application. Accordingly, the information set forth in the

AO 72
(Rev. 8/82)

affidavit was not stale and provided ample probable cause to believe that evidence of counterfeiting would be found at that location at the time the warrant was issued. As a result, defendant's staleness challenge has no merit.

### 3. **Reliability**

Defendant next argues that the affidavit lacked probable cause because the information upon which it was based was unreliable and uncorroborated. Specifically, he argues that the information provided by R.H. and CW1 was unreliable because of their criminal histories and that the information received from R.H., J.R. and CW1 was unreliable because "all three ... walked out of their interviews without having any charges filed against them or any imposition placed upon their respective liberties." He further argues that the unreliable information from R.H. and J.R. was insufficient to establish probable cause because it was "uncorroborated by any information other than the information of the other." Defendant's position is without merit.

As already discussed, in making a probable cause determination "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [her], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238.

"A magistrate may issue a warrant relying primarily or in part upon the statements of a confidential informant, so long as the totality of the circumstances gives rise to probable cause." United States v. Stearn, 597 F.3d 540, 555 (3d Cir. 2010). However, "[i]nformants are not presumed to be credible, and the government is generally required to show by the totality of the

circumstances either that the informant has provided reliable information in the past *or* that the information has been corroborated through independent investigation." Yusuf, 461 F.3d at 384 (emphasis added). "It is enough, for purposes of assessing probable cause, that 'corroboration through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.'" Gates, 462 U.S. at 244-45 (*citation omitted*).

In this case, contrary to defendant's argument that the information from R.H. and J.R. was not corroborated by any other information other than the information from each other, the affidavit contains information from *three* separate sources - CW1, R.H., J.R. - indicating that the manufacturing of counterfeit currency was taking place at 908 Brookline Boulevard, Apt. #2. The information first came through CW1, who provided first-hand knowledge of that activity at that location from August 2011 to May 2012, to include detailed descriptions of the manufacturing materials and process. Government Exhibit 2 at ¶¶12-15. CW1 also provided information that he received from K.W. that defendant had a new technique for manufacturing the counterfeit currency, which he described, and that defendant still was manufacturing the counterfeit currency at Sherita Howard's residence. Government Exhibit 2 at ¶¶17-18.

In turn, CW1's information was corroborated by the information from R.H., who also had first-hand knowledge of the manufacturing process and materials and indicated that he was at 908 Brookline Boulevard, Apt.#2, on June 18, 2013 where the currency was being manufactured. Government Exhibit 2 at ¶¶21-23. The information from both CW1 and R.H. further was corroborated by the information from J.R., who indicated that he had been to 908 Brookline Boulevard, Apt. #2, on numerous occasions and received counterfeit currency while he was there.

AO 72
(Rev. 8/82)

Government Exhibit 2 at ¶¶25-26. In addition, it should be noted that Agent Kernan recognized both R.H. and J.R. from surveillance video obtained during the course of his investigation into the passing of counterfeit currency.    Government Exhibit 2 at ¶¶20; 24.

Thus, the information from each of these three different sources corroborated the information from each of the others, thereby reducing "the chances of a reckless or prevaricating tale" and providing a substantial basis for crediting the information received from each. Gates, 462 U.S. at 244-45.  Accordingly, the totality of the evidence was sufficient to give rise to probable cause to believe that evidence of criminal activity would be found at the location searched.

Defendant further challenges the reliability of the information from all three informants on the grounds that all are "known criminals" and they all "gave incriminating information in exchange for their freedom or other considerations."  These challenges equally are unavailing.

First, defendant cites no authority suggesting that information received from a convicted felon is unreliable *per se* for the purposes of making a probable cause determination.  To the contrary, it certainly is not uncommon for informants to have checkered pasts, and that fact alone does not make them, or the information they provide, unreliable. *See, e.g.,* United States v. Sanchez, 246 Fed. Appx. 803, 805 (3d Cir. 2007)("that the Informant is an unsavory character with a questionable moral compass does not, *per se*, doom a finding of probable cause").  Instead, "[c]ourts may consider both the reliability of the informant and the reliability of the information," and probable cause is to be determined "by looking at the 'totality of the circumstances,' not isolated facts about ... character." Id. at 805-806 (emphasis added).

Accordingly, the fact that R.H. has an "extensive" criminal history, including convictions for "crimes of dishonesty," and that CW1 was "convicted and imprisoned" before being released

18

in 2013, does not constitute a basis for disregarding the *information* they provided. Here, both CW1 and R.H. had first-hand knowledge of the counterfeiting activities occurring at 908 Brookline Boulevard, Apt. #2, and both were able to provide detailed descriptions of the materials and procedures used in the manufacturing of the counterfeit currency, enhancing the reliability of the information they provided. Significantly, as already discussed, the information received from CW1, R.H. and J.R. all corroborated the information received from the others. Thus, under the totality of the circumstances, the information each of the informants provided was reliable regardless of their criminal backgrounds.

Likewise, there is no merit to defendant's contention that the information from CW1, R.H. and J.R. was unreliable because all three "walked out of their interviews without having any charges filed against them or any imposition placed upon their respective liberties." First, defendant's allegation that each received a benefit, or hoped to receive a benefit, in exchange for their information is nothing but sheer speculation. Moreover, even if the court were to accept defendant's unsubstantiated insinuation that all three had ulterior motives for providing information, as already noted, all of the information they provided nevertheless was based on first-hand knowledge and explicitly detailed the counterfeiting activities. And, again, the information from each was corroborated by the information from the others. Accordingly, there was a substantial basis to credit the information provided, regardless of whether any, or all, of the three received, or hoped to receive, some benefit in exchange for it. *See* Gates, 462 U.S. at 234 ("even if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case").

AO 72
(Rev. 8/82)

Both the United States Supreme Court and the Court of Appeals for the Third Circuit have warned against the practice of "overly compartmentaliz[ing]" the determination of probable cause. Yusuf, 461 F.3d at 390. Instead, the probable cause determination is to be made only after considering the totality of the circumstances, which requires courts to consider the cumulative weight of the information set forth by the investigating officer in connection with reasonable inferences that the officer is permitted to make based upon the officer's specialized training and experiences. United States v. Arvizu, 534 U.S. 266, 275 (2002).

Here, the cumulative weight of the information set forth in the affidavit, consisting of information received from three separate sources, with the information from each corroborating the information received from the others, is more than sufficient to provide a substantial basis for Magistrate Judge Eddy's determination that there was a fair probability that evidence relating to the manufacturing of counterfeit currency would be found at 908 Brookline Boulevard, Apt. #2, on June 20, 2013. Accordingly, defendant's argument that the affidavit lacked probable cause because it was based on unreliable or uncorroborated information is without merit.

4. **False Statements & Material Omissions**

Defendant's third argument is that the affidavit contained false statements, and deliberately omitted material facts, designed to mislead the magistrate judge into issuing the search warrant. Defendant's challenge to the affidavit on this ground is governed by the decision of the United States Supreme Court in Franks v. Delaware, 438 U.S. 154 (1978). For the following reasons, the court finds that defendant has failed to make the substantial preliminary showing necessary to warrant a Franks hearing.

20

AO 72
(Rev. 8/82)

The Fourth Amendment prohibits the intentional or reckless inclusion of a material false statement in, or the omission of material information from, a search-warrant affidavit. United States v. Pavulak, 700 F.3d 651, 665 (3d Cir. 2010). In Franks, the Supreme Court determined that, upon an appropriate showing, a defendant has a right to an evidentiary hearing to challenge the truthfulness of factual statements made in an affidavit of probable cause supporting a search warrant, and created a mechanism to allow the defendant to overcome the general presumption that an affidavit of probable cause supporting a search warrant is valid. Yusuf, 461 F.3d at 383.

"The right to a Franks hearing is not absolute, however." Pavulak, 700 F.3d at 665. Rather, to establish that a hearing is warranted, Franks requires the defendant to: (1) make a "substantial preliminary showing" that the affiant knowingly or recklessly included a false statement in, or omitted facts from, the affidavit; and, (2) demonstrate that the false statement or omitted facts are "necessary to the finding of probable cause." Id.; Franks, 438 U.S. at 155-56 (emphasis added).

In order to make the requisite substantial preliminary showing, the defendant cannot rest on mere conclusory allegations or a "mere desire to cross-examine," but rather must specifically identify the alleged false statements or omissions in the affidavit and present an offer of proof contradicting the affidavit as well as a statement of supporting reasons. Franks, 438 U.S. at 171. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Id.. When attempting to demonstrate that the affiant included a false statement in a warrant affidavit, or omitted material from it, it is insufficient to prove that he acted with negligence or made an innocent mistake. Id.; Yusuf, 461 F.3d at 383.

Franks further instructs that even when the requirements of the substantial preliminary showing are met, no hearing is required if there remains sufficient content in the affidavit to

AO 72
(Rev. 8/82)

support a finding of probable cause after any material that is the subject of the alleged falsity or reckless disregard is set aside. Franks, 438 U.S. at 171-72. Thus, when faced with an affirmative misrepresentation, the court is required to excise the false statement from the affidavit, and, when faced with an omission, the court must remove the falsehood created by the omission by supplying the omitted information to the original affidavit. Yusuf, 461 F.3d at 384. If, upon the excision of false statements, and/or the addition of omitted information, there remains probable cause to support the issuance of the warrant, the false statements and omissions are not material to the original probable cause determination, and no Franks hearing is necessary. Id. at 383; Franks, 438 U.S. at 171-72.

Here, defendant is asserting that Agent Kernan both asserted facts that he either knew were false or were made with reckless disregard for the truth and that he omitted material facts knowingly or with reckless disregard for the truth. In evaluating whether an assertion or an omission was made with reckless disregard for the truth, the Third Circuit Court of Appeals has advised that: "(1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would want to know; and, (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting." Yusuf, 461 F.3d at 383 (quoting Wilson v. Russo, 212 F.3d 781, 783 (3d Cir. 2000)).

The court first will address defendant's allegations that the affidavit contained the following statements that were false or were made with reckless disregard for the truth: (1) that defendant "carries a Glock .45 at all times;" (2) that defendant "drives a dark colored Chevrolet Impala or ... Pontiac Grand Am;" (3) that CW1 identified Sherita Howard by name in his initial meeting with

22

Agent Kernan on June 7, 2013; and, (4) that A.P resided at 217 Locust Street, Pittsburgh, PA 15210, during the time frame of August 2011 to May 2012.

Initially, defendant has failed to make a substantial preliminary showing that any of these statements were false or that Agent Kernan had any reason to doubt the truth of what he was asserting at the time he prepared the affidavit. Defendant has furnished no affidavits or sworn statements from anyone contradicting the information in the affidavit, and the proof that he has offered is insufficient to establish that any of the asserted statements were false or either knowingly or recklessly included in the affidavit.[7]

The first two challenged statements are contained in ¶11 of the affidavit and relate to Agent Kernan's first interview with CW1. During that interview, Kernan reported that "CW1 also stated that Bagley drives a dark colored Chevy Impala or a dark colored Pontiac Grand Am, that he resides with numerous girlfriends, and that he carries a Glock .45, a firearm, at all times." Defendant contends that CW1's statements to Kernan were false, and had Kernan conducted additional investigation, he would have discovered that defendant "recently" had been stopped twice by law enforcement and had not possessed a firearm on either occasion and that defendant had been driving rented Hondas from February to May of 2013, not a Chevy or a Pontiac.

As proof that the challenged statements were false, defendant has submitted a copy of the police incident report from defendant's arrest on June 20, 2013,[8] which states that no weapons were

---

[7] In this regard, defendant on several occasions in his brief avers that "there is no evidence" to show the truth of the challenged statements. However, in determining whether a Franks hearing is required, the *defendant* carries the burden of making a substantial preliminary showing that the statements are false. Franks, 438 U.S. at 155-56 He has failed to meet that burden in this case.

[8] The police incident report incorrectly lists the date of defendant's arrest as June 19, 2013, which clearly is a typographical error. The testimony of Agent Kernan at the hearing establishes that defendant was arrested prior to the execution of the warrant on June 20, 2013. Doc. #74 at 20-21.

AO 72
(Rev. 8/82)

found, (Doc. #52, Ex. H), and a copy of impound records from a May 9, 2015, "stop" by law enforcement, which resulted in the towing and impoundment of a black Honda that defendant had been driving. (Doc. #52, Ex. I). Defendant also has submitted rental car records from February to May of 2013 indicating that he was renting Hondas during that time frame. (Doc. #52, Ex. J).

Defendant's offered proof fails to make a substantial showing that the statements set forth in ¶11 were false. Read in context, it is clear that the statements from CW1 relate to the period of time when he first met defendant in August 2011. *At that time*, CW1 indicated that he knew defendant to carry a Glock .45 "at all times" and to drive a dark colored Impala or Grand Am. Accordingly, the fact that defendant was renting Hondas in early 2013 does not establish that he was not driving an Impala or Grand Am in 2011. Nor does the fact that defendant did not have a Glock .45 on his person when he was stopped and his car was impounded in May 2015,[9] or, when he was arrested in June 2015, establish that defendant did not carry a Glock .45 in 2011.[10] Defendant has not submitted an affidavit or other sworn statement denying that he drove an Impala or Grand Am or carried a Glock .45 in August 2011, or offered any other substantial proof contradicting the statements in the affidavit on these matters.

Moreover, even if the challenged statements from CW1 were false, defendant has not made any showing that Agent Kernan knowingly or recklessly included them in the affidavit. The court "may properly infer that an affiant acted with reckless disregard for the truth where his affidavit contains an averment that was without sufficient basis at the time he drafted it." United States v.

---

[9] The court notes that the impoundment records make no indication as to whether defendant had a weapon on him at the time he was stopped and defendant has offered no other proof that he was not carrying a weapon at that time other than his conclusory allegation that he was not.

[10] Defendant's focus on the words "at all times" also is misguided, as it would not be reasonable to interpret CW1's statement literally to mean 24 hours a day, 7 days a week.

AO 72
(Rev. 8/82)

Brown, 631 F.3d 638, 649 (3d Cir. 2011). Here, there was no reason for Agent Kernan to doubt the basis of CW1's assertions at the time the affidavit was drafted, particularly when he was merely setting forth background information relating to when CW1 and defendant first met.

Nor was Agent Kernan obliged to investigate every single statement that CW1 made to verify its accuracy. "'[I]n general, the failure to investigate fully is not evidence of an affiant's reckless disregard for the truth.'" Brown, 631 F.3d at 648 (citation omitted). Thus, "[w]hether the FBI *could have* provided more information is not the benchmark, and other courts of appeals have rejected similar arguments." United States v. Shields, 458 F.3d 269, 280 (3d Cir. 2006)(emphasis added); *see also* Gourde, *supra*; United States v. Ozar, 50 F.3d 1440, 1446 (8th Cir.1995) (holding that trial court erred in focusing [its] Franks analysis on what the FBI could have learned with more investigation).

Defendant next challenges the statement set forth in ¶13 that "CW1 told [Kernan] that, from August 2011 to May 2012, thousands of dollars in counterfeit currency ... were manufactured ... at A.P.'s residence at 217 Locust Street, Pittsburgh PA, 15210 ...." Specifically, he contends that the statement that A.P. lived at 217 Locust Street, Pittsburgh, PA 15210 during the period of August 2011 to May 2012 is false and he submits as proof a protection from abuse order that A.P. secured against defendant in October 2012 listing A.P.'s address as 2623 Brownsville Road, Pittsburgh, PA 15227. (Doc. #69, Exhibit B).

Again, however, defendant's offer of proof falls woefully short of making a substantial preliminary showing that the challenged statement is false. The fact that A.P. lived on Brownsville Road in October 2012 does not establish that she did *not* live at 217 Locust Street at any time between August 2011 to May 2012, and defendant has submitted no affidavit or sworn statement

25

from A.P. indicating that she did not reside at 217 Locust Street during the relevant time period. Again, at this stage it is not the government's burden to show that A.P. did live there at that time but it is defendant's burden to show that she did not and he has failed to meet it here.

The final remaining statement that defendant alleges is false also is set forth in ¶13 of the affidavit: "CW1 told your Affiant that ... counterfeit currency ... [was] manufactured at Sherita Howard's residence located at 908 Brookline Boulevard, Apt. #2, Pittsburgh, PA 15226." Defendant asserts that this is a misrepresentation of what CW1 actually said at his first meeting with Agent Kernan on June 7, 2013, as demonstrated by a personal history summary prepared by Agent Kernan on June 8, 2013, in which he refers to Sherita Howard only as "Sheria LNU" (*i.e.*, last name unknown), and which lists defendant's addresses as 217 Locust Street and 156 Kirk Avenue. (Doc. #52, Ex. K). Based on this summary, defendant contends that Agent Kernan falsely misrepresented that on June 7, 2013, CW1 told him Sherita Howard's full name and that CW1 also told him that defendant resided at 908 Brookside Boulevard, Apt. #2.

Defendant's argument is without merit. First, contrary to defendant's argument, nowhere in ¶13 does Agent Kernan state that CW1 told him at the June 7, 2013, meeting that defendant lived at 908 Brookline Boulevard, Apt. #2, he merely refers to that address as "Sherita Howard's residence." Moreover, a thorough reading of the history summary establishes that although the report lists 217 Locust Street as *one* of defendant's addresses, it also explicitly lists 908 Brookline Boulevard, Apt. #2, as a secondary address, along with 156 Kirk Avenue as another possible residence. (Doc.#52, Ex. K).

Secondly, although the summary does list "Sheria LNU" as one of defendant's girlfriends, the fact that CW1 may have referred to her only as "Sheria" at the first meeting with Agent Kernan

AO 72
(Rev. 8/82)

does not establish that Kernan recklessly included a false statement in the affidavit, as further investigation undertaken prior to the warrant application established that her full correct name is Sherita Howard and that her address is 908 Brookline Boulevard, Apt. #2. Accordingly, any suggestion in the affidavit that Agent Kernan learned that information from CW1 during the initial meeting, even if he did not, would amount to nothing more than an innocent mistake, which is insufficient to establish a reckless disregard for the truth. Franks, 438 U.S. at 171.

Accordingly, because defendant has failed to make a substantial preliminary showing that the affiant knowingly or recklessly included false statements in the affidavit, no Franks hearing is required in this case. But even assuming *arguendo* that the any of the foregoing challenged statements were false, and were made knowingly or recklessly, defendant also has failed to show that any of them were material to the determination of probable cause. As already noted, when faced with an affirmative misrepresentation, the court is obliged to excise the asserted falsehoods from the affidavit. Yusuf, 461 F.3d at 384. If probable cause still exists even without the asserted falsehoods, the statements are not necessary to the finding of probable cause, and no Franks hearing is required. Id. at 383; Franks, 438 U.S. at 171-72.

The probable cause determination in this case was that there was a fair probability that evidence of the manufacturing of counterfeit currency would be found at 908 Brookline Boulevard, Apt. #2. The excision of all of the asserted falsehoods from the affidavit still would leave more than sufficient information to support that probable cause determination, as whether or not defendant carried a weapon at all times, drove a particular type and color of car, or whether A.P. lived at 217 Locust Street from August 2011 to May 2012, have nothing to do with whether evidence of counterfeiting would be found at 908 Brookline Boulevard, Apt. #2. Nor would the fact

27

that CW1 referred to Sherita Howard as "Sheria LNU" during his initial meeting with Agent Kernan impact that finding.

Accordingly, even had defendant made a substantial preliminary showing that the affidavit knowingly or recklessly included false statements, because none of those challenged statements were necessary to the finding of probable cause, they were not material, and the inclusion of those statements in the affidavit would have been insufficient to warrant a Franks hearing or to overcome the presumption of validity of the search warrant even if false.[11]

Defendant also alleges that Agent Kernan omitted the following information from the affidavit: (1) that CW1, R.H. and J.R. all were "well-acquainted;" (2) that all three received "benefits" in exchange for their information; (3) that R.H. also lived at 908 Brookline Boulevard, Apt. #2; (4) that R.H. has a criminal history with multiple convictions for crimes of dishonesty; and, (5) that R.H. was stopped by Wal-Mart security for passing counterfeit bills on June 10, 2013, and had blamed someone other than defendant for providing them to him.

However, defendant also has failed to make a substantial preliminary showing that any of this information knowingly or recklessly was omitted from the affidavit, or that any of the omissions were material. Again, defendant has submitted no affidavits or sworn statements to establish the truth of the statements he alleges were omitted, and the proof that he has offered is insufficient to establish that any of these purported omissions were material to the probable cause determination.

---

[11] In his *pro se* supplement, defendant alleges the affidavit contains another false statement. In ¶23, Agent Kernan indicates that "R.H. stated that Bagley also manufactures counterfeit checks by way of a 'check kit' that he purchased at Staples." Defendant alleges this statement is false because "Staples does not sell material to make checks with." Defendant offers nothing but his own conclusory allegation to show that Staples does not sell such kits, and, even if they do not, this statement clearly is immaterial to the probable cause determination.

AO 72
(Rev. 8/82)

Defendant first alleges that Agent Kernan knowingly omitted from the affidavit the "fact" that CW1, R.H. and J.R. all were "well-acquainted with each other." In support, he offers only a copy of Agent Kernan's memorandum of interview with Sherita Howard on June 20, 2013, which states that a minivan from which Sherita Howard was seen exiting was associated with the passing of counterfeit FRN's by "known associates of [defendant] to include R.H. ... J.R. [and two others]." (Doc. #52, Ex. C). Defendant alleges that this information would have shown that R.H., J.R. and CW1 were not "neutral, independent" witnesses.

This "omission" is immaterial. First, the magistrate judge was well-aware that all three individuals were "known associates" of defendant, as all three indicated that they were passing counterfeit currency for him. Second, the magistrate judge also was aware that R.H. and J.R. were acquainted with each other as they were caught passing counterfeit currency together. Finally, defendant has offered nothing but a conclusory allegation that CW1 was acquainted with either R.H. or J.R. Even assuming that one of the other two individuals listed in the interview memorandum is CW1, the fact that all three were associates of defendant does not mean that they were associates of one another beyond the fact that they all admittedly passed counterfeit currency for defendant.

Furthermore, as already discussed, the fact that the affidavit failed to include the complete criminal histories of CW1, R.H., and J.R., to include, in the case of R.H., "multiple" convictions for crimes of dishonesty, was not material to the finding of probable cause, since the information received from all three individuals was corroborated by the information from the other. *See, e.g.*, Sanchez, 246 Fed. Appx. at 805-06 (omission of information relating to informant's past, including a recent arrest and fact informant was on parole, not material or necessary to probable cause finding).

AO 72
(Rev. 8/82)

Defendant also offers nothing but speculation that R.H., J.R. and CW1 received any benefit in exchange for their information, and, as previously discussed, Agent Kernan was not required to include that sort of information in the affidavit of probable cause. If defendant desires to challenge the credibility of the three based on the assertion that they received a benefit, that is an issue for cross-examination at trial and is not information material to the probable cause determination.

The final two omissions alleged by defendant similarly are immaterial to the finding of probable cause. Defendant argues that Agent Kernan omitted information that R.H. also was living at 908 Brookline Boulevard, Apt. #2, at the time of the execution of the warrant. Again, defendant offers no affidavit or other sworn statement to establish that fact or to indicate that Kernan was aware of that information at the time he submitted the affidavit. Significantly, even assuming that R.H. was living at 908 Brookline Boulevard, Apt. #2, in June of 2013, had that information been included in the warrant, it actually would have bolstered the likelihood that evidence of counterfeiting activity would be found there, not made it less likely.

Lastly, defendant alleges that the affidavit omitted information indicating that R.H. had been caught attempting to pass counterfeit bills at a Wal-Mart on June 10, 2013, and that he had indicated that he had received the counterfeit currency "from his friend who was in the car." (Doc. #52, Ex. G). From video surveillance, Agent Kernan was able to identify J.R. and an African-American female as being in the car at the time. Id.. Defendant argues that Agent Kernan should have included this information in the affidavit because it shows that R.H. previously had blamed "someone in the car" for providing him with counterfeit currency, and defendant was not in the car at the time. However, the inclusion of this information in the affidavit would not have impacted the probable cause determination. Defendant has made no offer of proof establishing that R.H.

AO 72
(Rev. 8/82)

actually got the currency from someone in the car, or if he did, that the other individual in the car did not get the currency from defendant.

Thus, even assuming *arguendo* that any of the foregoing information knowingly or recklessly was omitted from the affidavit, defendant has failed to show that any of that information would have been material to the determination of probable cause. As already noted, when faced with an omission, the court must remove any falsehood created by the omission by supplying the omitted information to the original affidavit. Yusuf, 461 F.3d at 384. If, upon the addition of the omitted information, there remains probable cause to support the issuance of the warrant, omissions are not material to the original probable cause determination, and no Franks hearing is necessary. Id. at 383; Franks, 438 U.S. at 171-72.

Again, the probable cause determination in this case was that there was a fair probability that evidence of the manufacturing of counterfeit currency would be found at 908 Brookline Boulevard, Apt. #2. The addition to the affidavit of all of the "facts" that defendant alleges improperly were omitted would have had no impact on that probable cause determination, as none of the omitted information would have tended to negate the fair probability that evidence of the manufacturing of counterfeit currency would be found at 908 Brookline Boulevard, Apt. #2, on June 20, 2013. Because none of the omitted information was material, the omission of that information, even if done knowingly or recklessly, is insufficient to warrant a Franks hearing or to overcome the presumption of validity of the search warrant.

AO 72
(Rev. 8/82)

5.  **Particularity**

Defendant's final argument is that the search warrant failed to describe with sufficient particularity the location to be searched. Specifically, he argues that the description of the location as "908 Brookline Boulevard, Apt. #2 ... an apartment located on the second floor," was ambiguous and confusing because the apartment searched actually was on the top floor of a three-story building. The government asserts that the three-story building has a delicatessen on the ground floor, with apartment #1 on the first floor and apartment #2 on the second floor, and that the search warrant adequately describes the target location.

The court held an evidentiary hearing on July 30, 2015, limited solely to the issue of whether the warrant lacked particularity as to the location to be searched. Upon due consideration of the testimony adduced at that hearing, and the parties' arguments, for the following reasons the court is satisfied that the description of the location to be searched was sufficient to comply with the dictates of the Fourth Amendment.

<u>The Warrant</u>

The search warrant issued by Magistrate Judge Eddy on June 20, 2013, directed the executing law enforcement officers to "see Attachment A" for a description of the property to be searched and its location. Government Ex. 2. Attachment A to the search warrant provides:

> The residence located at 908 Brookline Boulevard, Apt. #2, Pittsburgh, PA 15226, which is an apartment within a three story building. The building is a light colored brick building that appears orange in color and has a green awning on the top of the building. The front of the building has four windows with white trim. The building has a brown door with 908 above the door and a business called Brookline Deli on the ground floor. The residence is an apartment located on the second floor. The rear of the residence has an alley.

32

<u>Evidentiary Hearing</u>

At the evidentiary hearing, the government presented the testimony of USSS Special Agent Mark Kernan. Kernan was the case agent assigned to the investigation in this case and he also was the affiant for the search warrant application.

Agent Kernan testified that he is familiar with various conventions for the way floors are designated on buildings in the area. Some buildings designate the entry level floor as the first floor, while others designate the entry level floor as the ground floor or the lobby with the ascending floors numbered, one, two, etc. (Doc. # 74 at 5-6). He stated that in preparing a search warrant he would reference the building configuration in describing the location to be searched. <u>Id</u> at 6.

Agent Kernan testified that they intended to search the apartment of defendant and Sherita Howard and that Sherita Howard was the leaseholder. <u>Id</u>. at 9. During the course of the investigation, individuals provided information that Howard lived at the target residence with defendant. <u>Id</u>. Agent Kernan obtained Howard's driver's license records from the Pennsylvania Department of Transportation which established her address as 908 Brookline Boulevard, Apt. #2, Pittsburgh, PA 15226. <u>Id</u>. at 10; *see also* Government Exhibit 1.

Agent Kernan further testified that the apartment that was searched was *not* Apartment #3 and to his knowledge there is no Apartment #3 at 908 Brookline Boulevard. <u>Id</u>. at 10-11. Instead, the apartment that was searched was Apartment #2, the target residence, and Sherita Howard was present during the search. <u>Id</u>. at 11. As to the floor numbering convention he used in the warrant application, Agent Kernan identified the floor with the deli as the ground floor rather than the first floor, with Apartment #2 on the second floor. <u>Id</u>. at 11-12.

33

Agent Kernan indicated that he described the target residence as being "on the second floor" based on two factors - the apartment number from the driver's license records and the fact that he had observed defendant "sticking his head out of the top window" when Agent Kernan was conducting surveillance of the building. Id.; *see also* Defendant's Exhibit A. He also stated they had no difficulty locating the correct apartment. Id. at 13.

On cross-examination, Agent Kernan indicated that it was a confidential witness who first provided the information that defendant was residing at 908 Brookline Boulevard but that he could not recall if that witness specifically told him an apartment number. Id. at 15. He further stated that he did not go inside the building to check mailboxes prior to the issuance of the warrant and that, at the time he prepared the affidavit, he was uncertain as to how many apartment units might have been in the building. Id. at 16-17.

Agent Kernan also testified on cross-examination that when he entered the building to execute the warrant, he did not notice any directories or signs and reiterated that he was proceeding on the basis of Sherita Howard's apartment number and his prior observation of defendant. Id. at 17-18. He stated that he did not see a number on the door and that he had no information prior to his entry into the building that there was a number on the door. Id. at 19. He testified that the building had three levels and that the ground level was the deli, the next level had at least one apartment and that the top level was the level with the target apartment. Id. at 19-20.

Agent Kernan further testified that while he was preparing the affidavit, other agents and local police were at the apartment to prevent any destruction of evidence. Id. at 20. Defendant was not present at the time of the execution of the warrant but had been on the sidewalk outside the residence for a short period before he was arrested on a local warrant and taken to jail. Id. at 20-21.

34

Upon his arrival at 908 Brookline Boulevard and entry into the building, Agent Kernan recalled going up one flight of stairs and then a "small flight to the left to enter the actual apartment." Id. at 20. However, he indicated he could not remember exactly how the steps were configured or whether there was a landing. Id. at 21.

Upon questioning by the court, Agent Kernan stated that despite the absence of a number on the door, he knew he was going to the correct apartment because of the driver's license information and the fact that he knew Sherita Howard was inside. Id. at 21-22.

## Discussion

The Fourth Amendment requires that warrants must "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The manifest purpose of the particularity requirement is to prevent general searches. Maryland v. Garrison, 480 U.S. 79, 84 (1987). "By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." Id.

In this case, defendant argues that the warrant failed to describe the location with sufficient particularity because it is unclear whether Apartment # 2 is on the second floor of the building, as set forth in the warrant, or on the third floor of the building. Because of this ambiguity, defendant contends that the warrant is invalid for lack of particularity. Upon careful consideration, the court is satisfied that the warrant adequately described the location to be searched with sufficient particularity to satisfy the Fourth Amendment.

35

"[A] search warrant directed against an apartment house will usually be held invalid if it fails to describe the particular apartment to be searched with sufficient definiteness to preclude a search of other units located in the building and occupied by innocent persons." United States v. Bedford, 519 F.2d 650, 654-55 (3d Cir. 1975). "However, 'it is enough if the description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended.'" Id. (*quoting* Steele v. United States No. 1, 267 U.S. 498, 503 (1925)). "'The standard . . . is one of practical accuracy rather than technical nicety.'" Bedford, 519 F.2d at 655 (*citation omitted*).

In this case, reading Attachment A in its entirety, there is sufficient definiteness in the description of the location to be searched that the executing officers reasonably could have ascertained and identified the place to be searched without mistakenly searching a location occupied by an innocent person, regardless of any ambiguity that may have been created by the way that Agent Kernan identified the floors.

Here, the warrant sets forth the correct address of the target location giving a street address, apartment number, city, state and zip code. It describes in detail what the building looks like, "a light colored brick building that appears orange ... and has a green awning." It describes the front of the building as having four windows with white trim, and states that it has a brown door with "908" above it. Significantly, it states that there is "a business called Brookline Deli *on the ground floor*." (emphasis added). After identifying the entry level as the ground floor, the warrant then states that the "residence is an apartment located on the second floor."

The foregoing description of the location to be searched was sufficient to allow the executing officers "to ascertain and identify the place intended." The intended target apartment

AO 72
(Rev. 8/82)

was the apartment occupied by Sherita Howard, which investigation established was Apartment #2. Based on his observation of defendant looking out the top window, Agent Kernan reasonably concluded that Apartment #2 was on that level of the building. Accordingly, in light of the foregoing information, along with his experience with the configuration of buildings, Agent Kernan explicitly identified the entry level which had the deli as the "ground floor" and identified Apartment # 2 as being on the second floor. Having been provided this description, an executing officer would have been able to ascertain that the deli was on the ground floor, and would have proceeded up two floors from the ground floor to the second floor, where the target apartment was located. *See* United States v. Ritter, 416 F.3d 256, 266 (3d Cir. 2005)("warrant ... will ... be upheld against a particularity challenge if the warrant described the structure as it was known or should have been known to the officers after reasonable inquiry under the circumstances").

Moreover, the court is satisfied that the warrant described the location to be searched with sufficient definiteness as to preclude a mistaken search of other units located in the building and occupied by innocent persons. Courts have held that mistake is less likely when the premises have been under surveillance. United States v. McCain, 677 F.2d 657, 661 (8th Cir. 1982); United States v. Gitcho, 601 F.2d 369, 371 (8th Cir. 1979). Moreover, a mistaken search is less likely where the same officer both applies for and executes the warrant. McCain, 677 F.2d at 661.

In this case, Agent Kernan, based on his surveillance and his prior investigation, knew exactly what location he needed to search, *i.e.*, Apartment #2, occupied by Sherita Howard. He both prepared the affidavit, describing the location accurately, and executed the warrant, searching only that apartment. Finally, he knew he was searching the correct apartment, even though there was no number on the door, because the officers earlier had encountered Sherita Howard exiting

37

the apartment, officers had remained at the scene while Agent Kernan prepared the affidavit, and Sherita Howard was present during the execution of the search.

Accordingly, under these circumstances, there was no possibility that officers mistakenly could have conducted a search of the wrong apartment in this case even if the description in the warrant arguably could be described as ambiguous. *See* United States v. Bonner, 808 F.2d 864 (1st Cir. 1986)(warrant omitting address entirely upheld against particularity challenge where agents, having previously conducted surveillance, knew exactly which house they wanted to search, described it accurately and searched only that house); United States v. Hassell, 427 F.2d 348, 349 (6th Cir. 1970)(description of place to be searched as "Howard Hassell farm" sufficient to allow officers to ascertain place to be searched, especially since some officers remained at the scene while another obtained the warrant).

It is axiomatic that "[a] 'grudging or negative attitude by reviewing courts towards warrants' is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." United States v. Jones, 994 F.2d 1051, 1057 (3d Cir. 1993)(*quoting* United States v. Ventresca, 380 U.S. 102, 108 (1965)). Accordingly,"'the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.'" Jones, 994 F.2d at 1055 (*quoting* Ventresca, 380 U.S. at 109).

Here, even if this arguably were a "marginal case," the court nevertheless is satisfied that the description set forth in the warrant was sufficiently particular to ensure that the officers reasonably could, and in fact did, identify the appropriate place to be searched, and to ensure that the officers did not search the wrong apartment. The target location in this case, the location for which probable cause had been established, was the apartment leased by Sherita Howard. The

38

warrant set forth the correct address for that apartment as 908 Brookline Boulevard, Apartment #2, with an adequate description of its location, and that is the apartment that was searched.[12] Accordingly, the court finds that the warrant was not invalid for lack of particularity as to the location to be searched.

## Good Faith

Finally, even assuming *arguendo* that the search warrant in this case was invalid due to a lack of particularity, the court nevertheless would find that the evidence seized pursuant to that warrant should not be suppressed because the good faith exception would apply.

When the government seeks to admit evidence collected pursuant to an illegal search or seizure, the judicially created doctrine known as the exclusionary rule at times suppresses that evidence and makes it unavailable at trial in order to deter Fourth Amendment violations. Herring v. United States, 555 U.S. 135, 139 (2009). However, even when the government violates the Fourth Amendment, ill-gotten evidence will not be suppressed when the good faith exception to the exclusionary rule applies. US v. Katzin, 769 F.3d 163, 169-170 (3d Cir. 2014); *See, e.g.*, United States v. Leon, 468 U.S. 897, 920–26 (1984) (refusing to exclude fruits of unreasonable search because officer acted with objective good faith on later invalidated warrant).

---

[12] The court notes that any ambiguity in this case could have been avoided altogether had the warrant simply described the place to be searched as "Apt. #2, occupied by Sherita Howard ..." *See* Bedford, 519 F.2d at 655 (warrant is valid if it specifies name of occupant of apartment against which it is directed even in absence of *any* physical description of the particular apartment). However, as already noted, the standard is one of "practical accuracy" rather than "technical nicety." Bedford, 519 F.2d at 655 Thus, the issue is not whether the description of the location could have been better but whether the description of the location was sufficiently particular to enable the executing officers to ascertain and identify the target location. The court is satisfied that in this case that it was.

AO 72
(Rev. 8/82)

Despite its connection to the Fourth Amendment, there is no constitutional right to have the evidentiary fruits of an illegal search or seizure suppressed at trial. Katzin, 769 F.3d at 170; Davis v. United States, ___ U.S. ___, 131 S.Ct. 2419, 2426 (2011). Accordingly, simply because a Fourth Amendment violation occurs does not mean that exclusion necessarily follows. Herring, 555 U.S. at 140. Rather, "exclusion 'has always been our last resort, not our first impulse.' " Id. (*quoting* Hudson v. Michigan, 547 U.S. 586, 591 (2006).

"Application of the exclusionary rule is instead limited to those 'unusual cases' in which it may achieve its objective: to appreciably deter governmental violations of the Fourth Amendment." Katzin, 769 F.3d at 170; Leon, 468 U.S. at 909, 918. Where the particular facts of a case indicate that law enforcement officers "act[ed] with an objectively 'reasonable good-faith belief' that their conduct [was] lawful, or when their conduct involve[d] only simple, 'isolated' negligence," there is no illicit conduct to deter. Katzin, 769 F.3d at 171 (*quoting* Leon, 468 U.S. at 909). Alternatively, where law enforcement conduct is "deliberate, reckless, or grossly negligent" or involves "recurring or systemic negligence," deterrence holds greater value and often outweighs the associated costs. Davis, 131 S.Ct. at 2427–28 (*quoting* Herring, 555 U.S. at 144).

"Put differently, exclusion is appropriate only where law enforcement conduct is both 'sufficiently deliberate' that deterrence is effective and 'sufficiently culpable' that deterrence outweighs the costs of suppression." Katzin, 769 F.3d at 171; Herring, 555 U.S. at 144. Thus, determining whether the good faith exception applies requires courts to answer the "objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." Herring, 555 U.S. at 145 (*quoting* Leon, 468 U.S. at 922 n. 23).

AO 72
(Rev. 8/82)

Here, the court is satisfied that even had the warrant lacked particularity as to the location to be searched, the officers nevertheless acted with a reasonable good faith belief that they were operating lawfully in searching Sherita Howard's apartment, and the failure of the warrant to specifically state that Apt. #2 was occupied by Sherita Howard would amount to nothing more than "isolated negligence." Under the circumstances of this case, the court finds that the conduct of Agent Kernan neither was "sufficiently deliberate" that deterrence would be effective nor "sufficiently culpable" that deterrence would outweigh the costs of suppression.

Accordingly, even had the warrant lacked particularity, the court would find no basis to suppress evidence seized pursuant to that warrant where the reliance on it was objectively reasonable.

C.    Conclusion

It is a well-established maxim that searches conducted pursuant to a warrant are to be preferred. *See* Ventresca, 380 U.S. at 744. Here, Magistrate Judge Eddy, considering the totality of the circumstances set forth in the affidavit, determined that there was a fair probability that evidence relating to the manufacturing of counterfeit currency would be found at 908 Brookline Boulevard, Apt. # 2, on June 20, 2013, and issued a warrant to search that location.

There is a substantial basis for the probable cause determination in this case. The information set forth in the affidavit was reliable and corroborated, and was not stale. Defendant also has failed to make a substantial preliminary showing that the affiant knowingly or recklessly made false statements in, or omitted material information from, the affidavit necessary to the probable cause determination.

Finally, the warrant adequately described the location to be searched with sufficient particularity, and, even if it did not, the good faith exception to the exclusionary rule would apply. Accordingly, defendant's motion to suppress evidence seized during the search of 908 Brookline Boulevard, Apt. # 2, on June 20, 2013, will be denied.

An appropriate order will follow.

Date: _September 29, 2015_      _Gustave Diamond_

Gustave Diamond
United States District Judge

cc:    Shardul S. Desai
       Assistant U.S. Attorney

       Michael E. Moser, Esq.
       2661 Clearview Road
       Suite 8
       Allison Park, PA 15101

AO 72
(Rev. 8/82)